632 So.2d 62 (1993)
Randall Scott KNOWLES, Appellant,
v.
STATE of Florida, Appellee.
No. 79644.
Supreme Court of Florida.
December 16, 1993.
Rehearing Denied February 24, 1994.
*63 Nancy A. Daniels, Public Defender, and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Sara D. Baggett, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Randall Scott Knowles, a prisoner under two sentences of death, appeals his convictions and sentences. We have jurisdiction. Art. V, § 3(b)(1), Florida Constitution.
On July 13, 1991, at approximately 5:30 p.m., thirty-eight-year-old Randall Knowles entered a trailer next door to his father's trailer and shot and killed a ten-year-old girl whom he had never met. Knowles then shot his father who was outside in the father's truck. After pulling the elder man from the truck and throwing him to the ground, Knowles left the scene in the truck.
According to testimony at trial, the day of the murders began with Knowles' friend, Earl Wingate, coming to Knowles' father's trailer with a hitchhiker. Knowles and the hitchhiker went to the store to buy a case of beer and then returned to the trailer to drink beer and play cards. Around 11 a.m., Knowles and Wingate left the trailer with the hitchhiker. After dropping the hitchhiker off at a truck stop, Knowles and Wingate drank more beer and "huffed"[1] toluene, a solvent that is used as, among other things, a lacquer thinner. Although Knowles generally huffed about a gallon of toluene each week, that day he shared a quart can with Wingate. While the two were riding around, Wingate purchased a .22 caliber rifle. Wingate and Knowles went behind Wingate's mother's house to test fire the new rifle. Knowles watched as Wingate shot cans. Around 3:30 or 4 p.m., Wingate went into the house and went to sleep, leaving Knowles in the woods behind the house. According to Wingate, when he last saw Knowles, Knowles was "torn up" but was not on a toluene high. Around 5 p.m., Wingate's mother, Alice Pitts, returned home to discover Knowles still sitting in her back yard. Mrs. Pitts testified that when she asked Knowles to leave, he did not respond, he sat there and stared at her. Knowles was the worst Mrs. Pitts had ever seen him; he was acting "like he was completely gone." Sometime between 5 and 5:30 p.m., Knowles stumbled off into the woods in the direction of his father's trailer.
Knowles returned to the trailer, got a .22 caliber semiautomatic rifle, and went next door, where ten-year-old Carrie Woods was helping June Skipper prepare for a birthday party. While waiting for the guests to arrive the two girls began to dance. As they danced, Knowles appeared on the front porch, opened the storm door, and entered the trailer. When June looked up, Knowles was standing in the trailer. His eyes were very bloodshot and he was holding a rifle at his side. The rifle was pointed at June. Knowles snapped his head back and turned the rifle to June's right and fired three shots, each of which struck Carrie Woods in the arm. One of the bullets passed through the young girl's arm into her body, puncturing her lung and aorta. The girl died a short time later.
After shooting the girl, Knowles exited the trailer and walked over to his father who had just gotten into his truck. The two exchanged words and Knowles grabbed the elder man's shoulder. Knowles said, "No you won't," and shot his father twice in the head. Knowles then pulled the seventy-seven-year-old man from the truck, threw him to the ground, where he died, and drove away in the truck.
Knowles drove to Glenn Roberts' house two hundred fifty miles away in Mulberry, Florida. Along the way, Knowles sold the *64 rifle for beer and gas money, and picked up a woman with whom he had sex. When he arrived at Roberts' house the next morning looking "haggard," Roberts asked, "What's wrong with you... . Did you kill someone?" Knowles admitted that he had and told Roberts that he had kicked in a trailer door and shot "a bunch" of people. Knowles also said that he shot one in his truck that he thought "might have been daddy." Roberts took Knowles to a telephone booth where Knowles called the Nassau County Sheriff's Office to inquire about any outstanding warrants issued for his arrest. However, Knowles hung up before obtaining the information. After determining that Knowles was wanted for the murders, Roberts informed police that Knowles was at his house. Knowles was arrested and charged with two counts of first-degree murder.
At trial, Wayne Johnson testified that approximately six weeks before the murders, Knowles told him that his father had a surprise coming because "he don't think I'm going to do it, but I am going to blow his s____t away." There was also testimony that several months before the murders, Knowles told Earl Fagin, an occupant of the trailer where Knowles later shot Carrie Woods, that "the day might come that he just may loose it" and start shooting people in the trailer park. But Knowles doubted "it'd be you all." According to the testimony, Knowles was drinking at the time he made each of these statements.
Knowles raised the defenses of insanity and voluntary intoxication and testified in his own behalf. Knowles testified that he started drinking moonshine when he was fourteen or fifteen years old, and started huffing lacquer thinner at the age of fifteen or sixteen. According to Knowles, around the time of the murder he would start drinking beer at 5:00 or 6:00 in the morning and would continue to drink all day. He would huff about a gallon of toluene a week. Although Knowles would remain high for around ten minutes from a single huff, once he started huffing he would generally "stay on it all day," causing him on occasion to hallucinate and have memory blackouts. Knowles explained that when he would come down off a toluene high he would get nauseous and have headaches. To kill the pain he would have to huff more toluene or take massive quantities of "Goody's Headache Powders." When Knowles would finally stop huffing the high would last thirty minutes to an hour. Knowles also described his memory deficit and various physical problems, such as the coughing up of blood and numbness and tremors in the extremities.
Knowles claimed that he did not remember the shootings. Knowles did remember Earl Wingate bringing the hitchhiker to the trailer. He remembered buying beer and returning to the trailer. He also claimed to remember huffing toluene with the hitchhiker and then waking up "down Florida" with a woman, selling the rifle and going to Roberts' house where he was later arrested. Knowles maintained that he had no wish to harm either his father whom he loved or Carrie Woods whom he did not know.
There also was extensive guilt phase testimony from both defense and state mental health experts that Knowles suffers from an organic mental disorder, has a low average intelligence, has chronic memory impairment, and shows signs of organic brain damage from long-term alcohol and solvent abuse. There was also testimony that Knowles was insane at the time of the murders or was so intoxicated that he was incapable of premeditating. Although the state presented expert testimony that Knowles was both sane and able to premeditate at the time of the murders, even one of the state's mental health experts agreed that Knowles' capacity to premeditate was decreased due to his use of alcohol and toluene.
During the penalty phase Knowles presented testimony of various friends and family members.
Knowles was found guilty of both counts of first-degree murder. The trial court followed the jury's recommendation of death for both murders. The court found one aggravating circumstance in connection with the murder of Carrie Woods[2] and three aggravating circumstances in connection with the *65 murder of Alfred Knowles.[3] The trial court rejected the statutory mental mitigating circumstances that the murders were committed while the defendant was under the influence of extreme mental or emotional disturbance and while the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. However, as nonstatutory mitigating factors the court "considered" the fact that Knowles has "a limited education, had on occasion been voluntarily intoxicated on drugs and alcohol, had two failed marriages, has a low average intelligence, has a poor memory, had inconsistent work habits, and loved his father."
Knowles raises thirteen points on appeal,[4] only eight of which merit discussion. Knowles' first claim is that the trial court erred by denying the defense's challenge of two prospective jurors for cause and then refusing to give requested extra peremptory challenges. This claim was not properly preserved for our review.
In Trotter v. State, 576 So.2d 691, 693 (Fla. 1990), we explained that
"[t]o show reversible error, a defendant must show that all peremptories had been exhausted and that an objectionable juror had to be accepted." By this we mean the following. Where a defendant seeks reversal based on a claim that he was wrongfully forced to exhaust his peremptory challenges, he initially must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted. The defendant cannot stand by silently while an objectionable juror is seated and then, if the verdict is adverse, obtain a new trial.
(footnotes omitted) (quoting Pentecost v. State, 545 So.2d 861, 863 n. 1 (Fla. 1989)). Knowles failed to object to a specific venireperson who ultimately served on his jury. Even now, Knowles does not claim that any of the jurors seated were biased.
Knowles' next claim is that it was error to allow the prosecutor to ask him whether he thought two state's witnesses were lying. On cross-examination, Knowles testified that he did not remember making the statement to Wayne Johnson about giving his father a surprise one day. Knowles also claimed that he did not remember making the statement to Earl Fagin about shooting people in the trailer park. In both instances, the state asked Knowles, over objection, whether he thought the state's witness was lying and why.
We agree that this line of questioning was improper. In Boatwright v. State, 452 So.2d 666 (Fla. 4th DCA 1984), the court explained that asking a witness if a prior witness who testified differently is lying is improper for a number of reasons. First, allowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury to determine a witness's *66 credibility. Second, although the fact that two witnesses disagree does not necessarily establish that one is lying, such questioning may lead the jury to conclude that the witness being questioned is actually lying. Finally, unless there is evidence that the witness is privy to the thought processes of the other witness, the witness is not competent to testify concerning the other's state of mind. 452 So.2d at 668. While this line of questioning was error, under the circumstances we find the error harmless beyond a reasonable doubt. Knowles testified that he did not remember making the statements. Thus, the jury could have believed both Knowles and the state's witnesses. Because the improper questioning concerning the veracity of the state's witnesses did not necessarily lead to the conclusion that Knowles was lying, there is no reasonable possibility that the error affected the outcome of Knowles' trial.
Next we turn to Knowles' claim challenging the sufficiency of the evidence. Although we find sufficient evidence to support the conviction for the first-degree murder of Alfred Knowles, we agree that there was insufficient evidence of premeditation in connection with the murder of Carrie Woods. Knowles had never met the young girl prior to the brief encounter ending in her death. According to June Skipper, when Knowles first entered the trailer the semiautomatic rifle was pointed at her but at the last minute Knowles pulled his head back and fired the gun to her right, striking Carrie Woods in the arm with each of the blasts. Under the circumstances, Knowles' prior statement, made while he was drinking, that he just might lose it and start shooting people in the trailer park is insufficient to support a finding of premeditation. However, there is sufficient evidence to support a conviction of murder in the second degree. See Purkhiser v. State, 210 So.2d 448 (Fla. 1968) (although evidence that young girl was shot during sudden, brief encounter between her father and defendant who came to door in search of another man was insufficient to prove premeditation, evidence was sufficient to support conviction of second-degree murder).
Turning to the penalty phase of the trial, we agree that the aggravating factors of committed in order to avoid arrest[5] and committed during the course of a robbery[6] were improperly found in connection with the murder of Alfred Knowles. The fact that Knowles took his father's truck after shooting Carrie Woods does not establish beyond a reasonable doubt that Knowles killed his father in order to avoid arrest. There is no other evidence that Knowles' dominant motive for killing his father was to avoid arrest. Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Menendez v. State, 368 So.2d 1278 (Fla. 1979). Knowles could have shot his father for the same unexplained reason that he shot Carrie Woods, or for some other undisclosed reason, and then decided to leave in the truck which according to testimony he often drove. Moreover, because Knowles had free access to his father's truck prior to the shooting, and there is no evidence that Knowles intended to take the truck from his father prior to the shooting, or that he shot his father in order to take the truck, the aggravating factor of committed during the course of a robbery likewise cannot stand.
We find no merit to Knowles' contention that a contemporaneous conviction of murder cannot be used to establish the aggravating factor of prior conviction of a violent felony under section 921.141(5)(b), Florida Statutes (1991). See Pardo v. State, 563 So.2d 77, 80 (Fla. 1990) (contemporaneous conviction of violent felony may qualify as aggravating factor under section 921.141(5)(b) if the two crimes involved multiple victims or separate episodes), cert. denied, 500 U.S. 928, 111 S.Ct. 2043, 114 L.Ed.2d 127 (1991); Correll, 523 So.2d at 568 (where defendant was convicted of four capital felonies, the aggravating factor of prior conviction of capital felony was properly applied to each of the murders).
*67 However, we agree with Knowles that the trial court erred in failing to find uncontroverted mitigating circumstances. Although urged by defense counsel, the trial court failed to find that Knowles' capacity was impaired under section 921.141(6)(f), Florida Statutes (1991), or that Knowles was under the influence of extreme mental or emotional disturbance under section 921.141(6)(b), Florida Statutes (1991). As noted above, the only evidence "considered" in mitigation was "the testimony presented indicating that [Knowles] had a limited education, had on occasion been voluntarily intoxicated on drugs and alcohol, had two failed marriages, has a low average intelligence, has a poor memory, had inconsistent work habits, and loved his father."
As noted above, there was extensive uncontroverted evidence of Knowles' neurological deficiencies resulting from extended abuse of alcohol and solvents. There also was uncontroverted evidence that Knowles was intoxicated at the time of the murders. Mrs. Pitts, the last person to see Knowles prior to the murders, described him as being "completely gone." Consistent with this lay perception, Dr. Harry Krop, a clinical psychologist, testified that in his opinion at the time of the murders Knowles was in an acute psychotic state due to extreme intoxication causing him to be confused, irrational, impulsive and unable to remember the events that transpired. Taking into account the irrationality of the murders and the fact that Knowles was a neurologically impaired chronic alcohol and solvent abuser who was intoxicated at the time of the murders, Dr. Krop was of the opinion that Knowles was so severely impaired that he was unable to premeditate. Dr. David Sall, a psychiatrist, testified that in light of Knowles' organic brain damage and intoxication it was his opinion that Knowles did not know what he was doing at the time of the murders. Dr. Sall further testified that like Dr. Krop, he was of the opinion that Knowles was so impaired at the time of the murders that he was incapable of premeditating.
While the state presented evidence to refute Knowles' claims of insanity and inability to premeditate due to voluntary intoxication, the state offered nothing to rebut the lay and expert testimony reasonably establishing that Knowles' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired and that he was under the influence of extreme mental or emotional disturbance at the time of his father's murder. Even the state's mental health expert, Dr. George Barnard, conceded that although in his opinion Knowles was sane at the time of the murders, Knowles' ability to premeditate was in fact impaired.
The rejection of Knowles' insanity and voluntary intoxication defenses does not preclude consideration of statutory and nonstatutory mental mitigation. Campbell v. State, 571 So.2d 415, 418-19 (Fla. 1990); Mines v. State, 390 So.2d 332, 337 (Fla. 1980), cert. denied, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308 (1981). Moreover, we have made clear that "when a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved." Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990); see also Campbell, 571 So.2d at 419. Thus, the trial court erred in failing to find as reasonably established mitigation the two statutory mental mitigating circumstances, plus Knowles' intoxication at the time of the murders, and his organic brain damage.
The only other claim we need address is Knowles' claim that death is not warranted in this case. Since we have held both the during the course of a robbery and the to avoid arrest aggravating factors invalid, the only aggravating factor that can be considered in connection with Alfred Knowles' murder is the contemporaneous conviction for the murder of Carrie Woods. In light of the bizarre circumstances surrounding the two murders and the substantial unrebutted mitigation established in this case, we agree that death is not proportionately warranted.
Accordingly, we reverse the conviction for the first-degree murder of Carrie Woods and remand for reduction of that conviction to murder in the second degree and for resentencing in connection with that conviction. We affirm the conviction for the first-degree *68 murder of Alfred Knowles, vacate the death sentence, and remand for imposition of a life sentence without eligibility for parole for twenty-five years. In its discretion, the trial court may impose either concurrent or consecutive sentences.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, KOGAN and HARDING, JJ., concur.
GRIMES, J., concurs with an opinion.
GRIMES, Justice, concurring.
I believe the court properly found that the murder of Knowles' father was committed during the course of a robbery. Admittedly, his father allowed him to use the truck from time to time when he was sober. Surely, however, his father's consent did not extend to being shot in the head, pulled out of the truck, and having the truck driven two hundred fifty miles away.
I also believe there was sufficient evidence from which a jury could properly conclude that Knowles was guilty of the premeditated murder of Carrie Woods. He had previously threatened to shoot the occupants of the trailer park when he entered Carrie's trailer carrying a rifle. After pointing the rifle at Carrie's friend, he then turned and shot Carrie three times. There can be no doubt that Knowles meant to kill her. See Sireci v. State, 399 So.2d 964, 967 (Fla. 1981) ("Premeditation does not have to be contemplated for any particular period of time before the act, and may occur a moment before the act."), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982). The majority confuses Knowles' bizarre conduct and absence of motive with the lack of premeditation. Knowles' claim of insanity was rejected, and just because the undisputed evidence of his abnormal mental condition requires us to reduce his sentence to life imprisonment does not mean that he did not intend to kill Carrie Woods.
NOTES
[1] The term "huffing" refers to the practice of wetting a rag with a substance such as toluene and breathing it in and out through the mouth.
[2] Prior conviction of a capital felony, the first-degree murder of Alfred Knowles.
[3] Prior conviction of a capital felony, the murder of Carrie Woods; murder committed during the course of a robbery; murder committed for the purpose of avoiding or preventing a lawful arrest.
[4] Knowles maintains that 1) the trial court erred by denying his challenge of two prospective jurors for cause and then refusing to give requested extra peremptory challenges; 2) the court erred by overruling his objection to the prosecutor's questions as to whether other witnesses were lying; 3) the court erred in admitting the testimony of Earl Fagin and Wayne Johnson; 4) the court erred in denying Knowles' motions for judgment of acquittal; 5) the court erred in finding that Knowles murdered his father for the purpose of avoiding arrest; 6) the court erred in finding that Knowles murdered his father during the course of a robbery; 7) the court erred in instructing the jury that it could find Knowles guilty of the murder of his father under a felony murder theory; 8) the court erred in using the contemporaneous murder convictions to aggravate each other; 9) the court erred in overruling several defense objections to the state's penalty phase closing argument; 10) the death sentence is not proportionately warranted in this case; 11) the court erred in not adequately instructing the jury on the weight its penalty phase recommendation would have; 12) the court erred in failing to find certain mitigation; and 13) the court erred in refusing to instruct the jury that the state had to prove that the aggravating circumstances outweighed the mitigating circumstances.
[5] § 921.141(5)(c), Fla. Stat. (1991).
[6] § 921.141(5)(d), Fla. Stat. (1991).