PER CURIAM.
Michael Renard Jackson appeals from a judgment of conviction of first-degree murder and a sentence of death, as well as a conviction for sexual battery by use of actual physical force likely to cause serious personal injury. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we reverse the convictions, vacate, the sentence of death, and remand for a new trial. We conclude that reversible error occurred in the guilt phase of the trial, when the State introduced a lengthy videotape of Jackson’s custodial interrogation in which the investigating officers repeatedly expressed their personal opinions about Jackson’s guilt and the victim’s character and family life.
FACTS AND PROCEDURAL HISTORY
Overview
This case involves the January 23, 2007, sexual battery and murder of Andrea Boyer (Boyer), the head veterinary technician at a veterinary clinic in Orange Park, Clay County, Florida. On January 23, 2007, Boyer was found dead near a kennel cage at her place of employment at approximately 6:45 a.m. She had been vaginally and anally raped, strangled manually and with a ligature, and her head bludgeoned with a fire extinguisher shortly after 5:30 a.m. Jackson, then a thirty-seven-year-old construction worker, was arrested approximately a month after the murder when the DNA found in Boyer’s vagina and rectum matched his DNA profile in the State’s DNA database (CODIS). Jackson lived and worked near the clinic and routinely passed the clinic when he walked to work down Wells Road in the mornings around the time the murder occurred. Jackson was indicted on March 9, 2007, for the first-degree murder of Boyer by strangulation and/or blunt-force trauma with a fire extinguisher, as well as sexual battery by use of actual physical force likely to cause serious personal injury. At the time of the indictment, Jackson was on felony probation for burglary of a dwelling and two counts of sexual battery on a fourteen-year-old girl, which occurred in 1986 when Jackson was sixteen years old.[1] He *331 served thirteen years of his thirty-year sentence.
Jackson entered a plea of not guilty and filed a number of motions challenging the constitutionality of Florida’s capital sentencing scheme. He also filed a motion to exclude his videotaped statement taken during his custodial interrogation. Although parts of the tape were redacted, the videotaped interrogation was played to the jury during the State’s case-in-chief. In this thirty-seven-minute videotaped interrogation, Jackson repeatedly denied knowing, raping, and killing Boyer despite the detectives’ repeated expressions of their personal belief and knowledge that Jackson committed the murders. At trial, Jackson maintained his innocence, but testified he had consensual sex with Boyer, whom he said he knew as “Haley,”[2] in the past and on the morning of her death. Jackson was ultimately convicted for the murder and sexual battery of Boyer. After the jury voted nine to three to recommend a sentence of death, the trial court imposed a sentence of death for first-degree murder finding that four aggravating factors[3] outweighed twenty-four nonstatu-tory mitigators.[4] The court also imposed a concurrent life sentence for sexual battery.
*332 Circumstances of the Murder
On the morning of the murder, Boyer left for work between 4:30 a.m. and 4:45 a.m.; her commute usually took between twenty and thirty-five minutes. A surveillance video taken at a local convenience store, which is located approximately three-quarters of a mile from the clinic, revealed that Boyer arrived around 5:10 a.m., made her purchases, and left at 5:12 а.m. The store manager, who had been manager for seven years, testified that she had never seen Jackson and Boyer together at the store and Jackson was not at the store that morning. On arrival at the clinic, Boyer deactivated the alarm of the main building at 5:24 a.m. Although she typically arrived early on Tuesdays to prepare the clinic for surgeries, she was unable to accomplish most of her tasks on this Tuesday morning because she was sexually battered and murdered.
A fellow employee found Boyer’s lifeless body near a kennel cage around 6:45 a.m. She was found nude from the waist down, with her underwear and scrubs wrapped around one ankle, shoes still on, and her shirt lifted just above her breasts. She had semen in her vagina and rectum, and her body was bruised and battered. There were visible bruises on her arms and hands, right hip, inner thighs, and upper back along her bra straps. Dr. Eugene Scheuerman, a forensic pathologist and medical examiner, testified that her hyoid bone,[5] a very difficult bone to break in a person Boyer’s age, was broken due to manual and ligature strangulation. Additionally, Boyer’s scalp had several lacerations, her skull was pushed into her brain, the bones in the thickest portions of her skull were broken, and her brainstem and midbrain had multiple pinpoint areas of hemorrhage. A blue tag from the nearby fire extinguisher was tangled in her hair and the silver pin from the fire extinguisher was on the ground near her body. The fire extinguisher had blood spatter, flesh, and hair on it.
Dr. Scheuerman testified that the bruises along both of Boyer’s arms were consistent with grabbing and that the bruises on her inner thighs were consistent with someone forcing her legs apart with their hands. He also testified that the incised wounds on her hands were consistent with defensive wounds caused by someone using a sharp-force object on her. He testified, however, that her bruises could not be aged and he could not specify the order in which they occurred. Regarding the injuries to her neck and head, Dr. Scheuerman testified that there were blunt-force wounds adjacent to her neck area, there were signs of manual and ligature strangulation, and that Boyer was likely in pain and frightened while strangled because the human instinct is to gasp for air and fight. Additionally, Dr. Scheuerman testified that bruising deep inside Boyer’s neck demonstrated that a great amount of force was used. The bruises on her neck were consistent with the use of a ligature similar to a dog leash and petechiae,[6] small red spots in and around her eyes, indicated her heart was *333 still beating while she was strangled. Her head injuries were consistent with being hit by the fire extinguisher multiple times while lying face down and the blood in her lungs is associated with breathing in blood from her head injuries.
The area where Boyer was found was a very tight space. It appeared to have been cleaned because the hose, which was normally up, was down, the floor had several areas where water had collected, and cleaning bottles were out from under the sink. Boyer’s scrubs and underwear were also wet. There was a kitchen steak knife with a bent tip and missing handle in the drain near her body. Additionally, approximately $100 was missing from the cash drawer in the main building, but there was no sign of forced entry or violence anywhere other than the kennel building, although Boyer’s blood was also found on the fence behind the clinic.
Jason Hall, a general superintendent at the construction company where Jackson worked, testified that Jackson arrived at work at approximately 6:00 a.m. on the morning of the murder. His demeanor did not seem odd, and he did not have cuts, bruises, or blood on his clothes. Byron Anderson, a defense witness, testified that on the day of the murder, he saw a light-colored truck, possibly silver, leaving the clinic around 5:45 a.m. with no headlights on. Jackson did not own or have access to a truck. Although Shad Boyer, Boyer’s husband, initially testified that he did not know anyone who owned a silver truck, upon further questioning he agreed that his mother owned a silver truck.
Investigation, Interrogation, and Jackson’s Trial Testimony
When Dr. Scheuerman arrived at the crime scene, he did not have a rape kit because he was unaware of a possible sexual battery. However, he requested a rape kit when he observed indicators of potential sexual battery, including Boyer’s age, how her clothes were positioned on her body, and how her legs were spread to an angle of about thirty degrees. Additionally, he noted that semen, visible from the external examination, was found just inside the vaginal lips. The location of the semen was consistent with sexual intercourse having occurred within two hours before her death. Dr. Scheuerman, however, could not specifically state when the sexual encounter occurred or how long the semen had been there.
The semen was collected and sent to the Florida Department of Law Enforcement (FDLE) for DNA testing to determine whether there was a match in CODIS. Initially, detectives conducted a very broad investigation, collecting DNA samples from Shad Boyer, Michael Norris (the victim’s ex-fiancé), and several homeless individuals from nearby homeless shelters, including Kenneth Sharp, who visited the clinic to see Boyer quite often. They also stopped passersby in the area and showed them photographs of Boyer. After a month-long investigation, however, the detectives discovered the DNA sample collected from Boyer’s vagina and rectum was a full match with Jackson’s DNA in CO-DIS. The DNA also matched a subsequent DNA sample, a cheek swab, collected from Jackson after his arrest. FDLE analyst Maria Lam testified that the chances of the DNA profile matching someone else is one in a quintillion Caucasians, one in 31 quadrillion African Americans, and one in 1.3 quintillion southeastern Hispanics.[7]
*334 The FDLE analyst, however, did not examine Boyer’s fingernail clippings, underwear, or scrubs for DNA. Other evidence, including hair, blood, and fingerprints, were sent to the FDLE laboratory, but only five of the twenty-six items of evidence collected at the crime scene were tested.[8] There was no evidence of third-party DNA in the five items tested and none of the other evidence tested matched Jackson’s DNA. Detective Martin Cotcha-leovitch also testified that none of the hairs on the scene were ever compared to Jackson’s or Boyer’s hair. Additionally, there were no eyewitnesses.
After discovering the DNA match, the detectives went to the hotel where Jackson shared a room with Elston and Rosemary Goolsby. Jackson accompanied Detective Cotchaleovitch and Detective Michael Calhoun to the Clay County Sheriffs Office where Jackson waived his Miranda[9] rights prior to the custodial interrogation. The interrogation was videotaped and lasted approximately two hours. At the very beginning of the interrogation, Jackson made several statements indicating that he lived and worked less than a mile away from the clinic, was usually awake between thirty minutes to an hour prior to the time Boyer arrived at the clinic, knew where the clinic was located, and usually arrived at work around 6:00 a.m., which is after the crimes had been committed according to the State’s theory. Additionally, after the detectives showed Jackson a photograph of Boyer, he denied knowing her. He also claimed that he never walked to work because Shawn Romedy, his supervisor at Grimes Contracting, always drove him to work.[10] Prior to trial, Jackson filed a motion to exclude the entire two-hour videotaped interrogation pursuant to section 90.403, Florida Statutes (2007), arguing that the probative value was substantially outweighed by the danger of unfair prejudice because the videotaped interrogation allowed the State to elicit sympathy for the victim and inform the jury that the police adamantly believed Jackson was guilty. The trial court denied his motion, but redacted several portions, ultimately reducing the videotape to thirty-seven minutes. The following portions, highlighted by Jackson as unfairly prejudicial, were not redacted:
DET. COTCHALEOVITCH: In your whole life never run into her? Don’t recognize her from anywhere?
JACKSON: No.
DET. COTCHALEOVITCH: The only question I have is why did you kill her?
JACKSON: Why did I kill her?
DET. COTCHALEOVITCH: Yeah.
JACKSON: What do you mean why did I kill her?
DET. COTCHALEOVITCH: Why did you kill her?
JACKSON: I ain’t kill her.
DET. COTCHALEOVITCH: If you want to rape her that’s one thing but to kill her that’s — (Inaudible.)—different ... You may not know it but we have physical evidence at our scene, okay, that we run tests on, semen that sort of thing.
JACKSON: My DNA?
*335 DET. COTCHALEOVITCH: Absolutely ...
JACKSON: I ain’t — listen, I ain’t killed nobody.
DET. COTCHALEOVITCH: Michael. Michael, we’re not — we’re not here to argue. We’re not mad, okay? What I want to understand is why this happened.
JACKSON: I ain’t killed nobody. I ain’t — ...
DET. COTCHALEOVITCH: ... The profile test that was matched, matched with your profile. It’s 100 percent guaranteed.
[[Image here]]
Listen to me. We’re not here to dispute it, okay? All we want to do is understand this, okay? ... We deserve that and we put a lot of hours into this case. We didn’t pick your name out of a hat. We’ve been talking to a lot of people, that’s true, but when we get a call from FDLE and they say without a doubt 100 percent that we have his DNA and this is your suspect then we start to work— (Inaudible.)
[[Image here]]
You don’t understand. When he says profile each one of us, me, him and you, okay, we’ve all got identifiers in our DNA that we cannot do anything about. They’re with you from the time you’re conceived in the womb, okay? ... This girl was killed. Do I think maybe that you went over there to actually murder the girl? I don’t know. I wasn’t there. You’re the only person that can provide that information to me.
JACKSON: I ain’t murdered nobody. ... I ain’t murdered nobody. I ain’t done nothing to nobody. I don’t go anywhere. I don’t walk anywhere.... I ain’t killed nobody, sir. I ain’t murdered nobody. I ain’t never murdered nobody. Don’t even think about murdering nobody.
DET. COTCHALEOVITCH: I know you did it. You used a fire extinguisher. I know you did it.... You know I’m right because the way you’re looking. I know....
JACKSON: Listen, sir, my semen ain’t there. I ain’t murdered, raped, however you want to say it.
DET. COTCHALEOVITCH: That’s right. If you hadn’t had that we probably would still be wondering, but unfortunately for you it’s there. It’s 100 percent. There’s no — no mistake on it, okay? It’s been checked and double-checked. Understand? We know, okay? ... It’s up to you whether you want to tell me why it happened....
JACKSON: I ain’t killed nobody.... I ain’t — listen, I ain’t murdered nobody. I ain’t killed nobody. I ain’t rape nobody. I ain’t done no harm to nobody. I ain’t left my house. When I leave there he picks me up at 6:30. 6:30 is when he picked me up. Honks the horn out front in the truck. We get in the truck....
DET. COTCHALEOVITCH: And I’ll be honest with you, I believe he probably picked you up that morning, too. Because — ... You had more than enough time to do it. It’s okay. I’m not going to dispute the fact that he probably did pick you up that morning because you would have been — you were about a half a mile from the scene. You’ve got plenty of time to get back.... There’s a lot of things that don’t make sense in this case, okay, and the fact that a girl was killed for no apparent reason. It makes no sense. That’s why I was hoping that you could tell me why this happened so at least I can understand it. I can’t change it and neither can you. You know that.
*336 JACKSON: I ain’t killed nobody.
DET. COTCHALEOVITCH: ... Making a bad decision doesn’t make you a horrible person, but what it does make you — the media is going to spin this where obviously you’re this bloodthirsty killer.... Now if I have your side of the story as to why you did what happened then I’ll be able to understand it.
JACKSON: There can’t be a side because I didn’t because I ain’t commit no crime....
DET. COTCHALEOVITCH: .. .— there’s no other person it could be, Michael. ...
JACKSON: You’re saying something I didn’t do.
DET. COTCHALEOVITCH: No. I’m saying something that you did do and you know in your heart you did it.
JACKSON: No, sir.
DET. COTCHALEOVITCH: There’s no doubt in my mind you did it, okay? There’s no doubt....
Nobody else — Michael, this is what you need to get your mind around, okay? You understand science, okay? It’s not like I picked your name out of a hat, okay? We got Michael Jackson’s name because of that — you are the DNA profile that we find at the scene, okay? This is how we connect you. You have no explanation of how you could have come inside her other than being there raping her and then consequently she dies....
JACKSON: I know I didn’t rape her and I know I didn’t murder nobody.
DET. COTCHALEOVITCH: Well, you may want to say that and you may want to think that you’re going to get out of this but you’re not....
JACKSON: ... I know I haven’t done nothing.
DET. CALHOUN: Let me explain something to you: If you’re not going to help us understand it then here’s the issues we’ve got. She was a head veterinarian technician at the vet clinic up there. She was doing well for herself. ... We don’t have any answers for anybody other than 100 percent without a shadow of a doubt you killed Andrea Boyer and you raped her, ... We have — we have a victim who is a 25, ... 26-year-old white female that’s just beginning her life. Just got married not too long ago, was wanting to start a family.
You know, her parents are very well-to-do. They got good jobs. Her husband works. She works. She had two jobs at one point. You know, this is not the case of the victim in this case is a nobody. This is somebody that was a rising star in her community. She— (Inaudible.) — animals.
DET. COTCHALEOVITCH: She was just trying to make a living, okay? That’s why she was at the vet clinic that early. She always comes in that early in the morning because she was a dedicated employee. She was the number one vet tech, okay? That is the truth. You have a mom and a dad? ... Would you want her to know what happened to you if somebody killed you? ... All right. You’ve already taken everything this girl’s got. Why can’t you just give a reason?
JACKSON: ... I mean I’m telling you I didn’t ...
DET. CALHOUN: You understand we’re going to Grimes.
We’re getting your employment records. We’re going to find out if you were late to work that day. We’re going to find out if you walked. We’re going to talk to your boss....
*337 DET. COTCHALEOVITCH: Were you angry at this girl?
JACKSON: I wasn’t angry....
[[Image here]]
JACKSON: ... I’m telling you I didn’t because I know I wasn’t there. I know I don’t leave the house.
DET. CALHOUN: So how you going to explain your DNA was in our victim? ... DNA was there the next day.
[[Image here]]
DET. COTCHALEOVITCH: Right now you’re sitting here lying to us when we have indisputable evidence, Michael .... We want to know what made you do it....
JACKSON: I can’t tell you something I didn’t do.
[[Image here]]
DET. COTCHALEOVITCH: You left the house. There’s no doubt, okay? This girl was killed and she was raped, okay? ...
JACKSON: ... you say you have the evidence to say that I did it.
DET. COTCHALEOVITCH: Absolutely, and that’s the thing. I wish I didn’t because you’re a nice guy. I mean you’re — you don’t seem like the kind of guy that would go half-cocked and kill this girl. I’ll be honest with you
DET. CALHOUN: Michael, you went to the vet clinic. You brutally raped this girl and you hit her multiple times in the head with a fire extinguisher. You left her there bleeding, half dressed for an employee to find her. You need to understand where we’re coming from.
JACKSON: I hear what you’re saying. I understand what both of you are saying and I know I didn’t do it.
[[Image here]]
DET. CALHOUN: Explain why your DNA is inside Andrea Boyer.
DET. COTCHALEOVITCH: Please, Michael, please.
JACKSON: ... I’m telling you I’m not — that I didn’t.
[[Image here]]
DET. COTCHALEOVITCH: Listen. Listen, there is no room for debate in this- I can’t go against DNA_ What is it that made you go off on this girl?
JACKSON: I mean there’s nothing else that I can say to otherwise say that, so I mean you saying that’s what you got and that’s what it is. I’m telling you I didn’t do it.... I mean y’all saying I worked and raped and murdered her and I know I didn’t do that....
DET. COTCHALEOVITCH: .. .— there’s no way to hide that stuff.
JACKSON: ... I didn’t do it. I mean there’s nothing else I can say....
DET. COTCHALEOVITCH: Well, no. If we had the truth about what happened there then I would obviously want to listen to that but you can’t deny science.
[[Image here]]
Listen, there is no mistake in this, okay? ... but the bottom line is you’ve got to get this off your chest and I need to know — ...
JACKSON: I ain’t do nothing, Mr. Marty.
Jackson was arrested immediately after the interrogation and all police investigation of the sexual battery and murder ceased, including testing other evidence for DNA.
Jackson’s testimony at trial differed significantly from his statements in the custodial interrogation. At trial, he testified that he not only knew Boyer, but had interacted with her fifty to sixty times and on several occasions provided her marijua *338 na and pills in exchange for consensual sex. According to Jackson, they routinely had sex in her truck around 5:00 a.m. to 5:20 a.m. in the parking lot of the hotel where he previously lived. He testified that during the police interrogation he did not recognize her photograph because it was “fuzzy,” she looked “fancy,” it was not a close-up, and another individual was in the photograph. He also testified that he did walk to work, but he did not walk to work in January and February, which is why he kept insisting during the interrogation that he did not walk to work on the day of the murder. Further, he testified that- he did not tell the police he had consensual sex with Boyer because, as a black man, he did not feel comfortable telling them he had sex with a white woman.
Regarding the day of the murder, Jackson testified that he met with Boyer at a gas station near the clinic and went to the hotel where he previously resided, which was close to the convenience store Boyer visited that morning. He testified that they smoked some marijuana and engaged in consensual vaginal sex in her truck, which took about twenty to thirty minutes in the 5:00 a.m. hour. He then walked to work and Boyer presumably drove to work. Jackson also explained that he would not have harmed Boyer because she was at one point pregnant with his child. A clinic employee later testified that Boyer had an abortion a few months prior to the murder for financial reasons, but Shad Boyer testified that the abortion was for health reasons.
Verdict and Sentence
Jackson was subsequently convicted for first-degree murder and sexual battery. Prior to the penalty phase, Jackson informed the court that he wished to waive his right to present mitigation testimony and evidence. The court engaged Jackson in several colloquies to ensure his decision to withhold mitigation evidence was voluntary.[11] After the State’s presentation of evidence of aggravation at the penalty phase, including evidence that Jackson was on felony probation at the time of the murder and that Jackson was previously convicted of a felony involving use or threat of violence, Jackson read a prepared statement and allowed Tom Waugh of the Clay County Sheriffs Office to testify. In Jackson’s prepared statement, he expressed remorse for his prior sexual battery convictions, but maintained he was not responsible for Boyer’s rape and murder. The jury recommended a death sentence by a nine-to-three vote. At the subsequent Spencer[12] hearing on May 19, 2010, Jackson allowed the defense investigator to testify regarding nonstatutory mitigation he had gathered. The trial court entered the sentencing order on July 16, 2010, finding that the four aggravating factors outweighed the twenty-four non-statutory mitigators, and imposed a sentence of death on Count I, first-degree murder, and a concurrent life sentence on Count II, sexual battery. We turn now to issues raised by Jackson.
ANALYSIS
Jackson raises five issues on ap *339 peal.[13] In addition, the Court has a mandatory duty to examine the sufficiency of the evidence regarding Jackson’s first-degree murder conviction and to determine whether the death sentence is proportionate. Because we find the trial court committed reversible error in the guilt phase by admitting Jackson’s videotaped custodial interrogation during the State’s case-in-chief, we only address Jackson’s first claim on appeal.
Jackson argues that the trial court erred by finding the videotaped statements, made after waiving his Miranda rights, admissible because their probative value is substantially outweighed by the danger of unfair prejudice pursuant to section 90.403, Florida Statutes (2007). The standard of review of a trial court’s decision to admit evidence is abuse of discretion. Williams v. State, 967 So.2d 735, 747-48 (Fla.2007); Johnston v. State, 863 So.2d 271, 278 (Fla.2003). That discretion, however, is guided by the rules of evidence. Id. For the following reasons, we agree with Jackson and find that the trial court abused its discretion by finding the videotaped interrogation admissible at trial.
Jackson contends that the videotaped interrogation allowed the State to elicit sympathy for the victim and informed the jury that the police adamantly believed Jackson was guilty. Thus, Jackson contends, the jury could not reasonably have been expected to disregard the strong inference of guilt created by the detectives’ repeated statements of personal beliefs and conclusions because of the significance the jury likely attached to their opinions.
Generally, a witness’ opinion as to the credibility, guilt, or innocence of the accused is inadmissible. See Seibert v. State, 923 So.2d 460, 472 (Fla.2006) (“allowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury”) (quoting Knowles v. State, 632 So.2d 62, 65-66 (Fla.1993)); Martinez v. State, 761 So.2d 1074, 1079 (Fla.2000) (stating that, generally, “a witness’s opinion as to the guilt or innocence of the accused is not admissible ... on the grounds that its probative value is substantially outweighed by unfair prejudice to the defendant”); see also Glendening v. State, 536 So.2d 212, 221 (Fla.1988) (“[a]ny probative value such an opinion [about the guilt or innocence of an accused] may possess is clearly outweighed by the danger of unfair prejudice”); Mohr v. State, 927 So.2d 1031, 1034 (Fla. 2d DCA 2006) (holding that appellate counsel’s failure to argue the trial court erred in admitting detective’s statements advising the jury of his personal belief in the defendant’s guilt, theories as to why the defendant committed the offense, and theories why the victim was honest, constituted ineffective assistance of counsel); Sparkman v. State, 902 So.2d 253, 257-59 (Fla. 4th DCA 2005) (holding officer’s out-of-court comments indicating his belief the defendant killed the victim were so prejudicial that the erroneous admission of the statements could not be considered harmless beyond a reasonable doubt); Pausch *340 v. State, 596 So.2d 1216, 1218-19 (Fla. 2d DCA 1992) (holding that admission of officer’s statement expressing his disbelief of the defendant’s story and accusing her of lying and committing the crime was reversible error). Moreover, and perhaps most importantly, “[p]olice officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy. A jury is inclined to give great weight to their opinions.... ” Tumblin v. State, 29 So.3d 1093, 1101 (Fla.2010) (quoting Bowles v. State, 381 So.2d 326, 328 (Fla. 5th DCA 1980)); see also Martinez, 761 So.2d at 1080 (“there is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant’s guilt”). Accordingly, it is especially troublesome when a jury is repeatedly exposed to an interrogating officer’s opinion regarding the guilt or innocence of the accused.
The State, however, argues that the detectives’ statements are admissible based on this Court’s precedent that a police officer’s statements during an interrogation are admissible if they provoke a relevant response or provide context to the interview such that a rational jury could recognize the questions are interrogation techniques used to secure confessions. See McWatters v. State, 36 So.3d 613, 638 (Fla.2010) (finding that trial court did not abuse its discretion because officer’s statements were not hearsay as they were admitted to provide context to the defendant’s responses and to set forth the circumstances in which the defendant admitted culpability); Jackson v. State, 18 So.3d 1016, 1031-32 (Fla.2009) (finding, in a Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), context, that the trial court did not abuse its discretion in admitting a recorded interview because the statements made in the interview were made to provoke a reaction and were included at trial to give context to the interview).
At the inception of the interrogation, Jackson provided information regarding where he lived, where he worked, what his daily routine was, and whether he knew the location of the clinic. All of Jackson’s responses tended to prove that he had the opportunity to commit the crime because they established that he lived and worked close to the clinic, was usually awake around the time the crimes were committed, knew where the clinic was located, and usually arrived at work around 6:00 a.m., which is likely after the crimes were committed. Additionally, other inquiries were meant to gauge whether Jackson would raise a credible defense of consensual sex with Boyer. Thus, to some extent, portions of the videotaped interrogation were relevant.
The great majority of the detectives’ statements, however, did not provoke relevant responses.[14] In addition, none of the detectives’ statements set forth the circumstances in which Jackson admitted culpability because he repeatedly denied in *341 volvement in Boyer’s sexual battery and murder. Indeed, after the court read the jury a standard jury instruction regarding the videotaped conversations,[15] the jury heard the investigating officers’ repeated personal opinions and proclamations of knowledge of Jackson’s guilt and his veracity. The following illustrate some of the most problematic and prejudicial assertions made by the detectives: (1) “the only question I have is: Why did you kill her”; (2) “I know you did it. You used a fire extinguisher. I know you did it”; (3) “No. I’m saying something that you did do and you know in your heart you did it”; (4) “There’s no doubt in my mind you did it, okay? There’s no doubt”; (5) ‘You have no explanation of how you could have come inside her other than being there raping her and then consequently she dies”; (6) “Well now we’re — you’re putting us — you in a position where we’re not — we don’t have any answers for anybody other than 100 percent without a shadow of a doubt you killed Andrea Boyer and you raped her”; and (7) “Michael, you went to the clinic. You brutally raped this girl and you hit her multiple times in the head with a fire extinguisher. ■ You left her there bleeding, half dressed for an employee to find her....” Additionally, the detectives stated that Boyer “[wanted] to start a family,” “her parents were very well-to-do,” this is not the type of case where the victim “is a nobody,” and Boyer was a “rising star in the community.”
While the detectives may have intended to secure a confession by consistently expressing their conviction in Jackson’s guilt, they did not secure a confession throughout their thirty-seven minute dialogue. In addition, although the detectives’ opinions about Jackson’s credibility, guilt, and the weight and sufficiency of the evidence were not expressed during in-court testimony, admission of these statements essentially permitted the State to improperly elicit police opinion testimony and invade the province of the jury. Cf. Seibert, 923 So.2d at 472 (“allowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury”) (quoting Knowles, 632 So.2d at 65-66); Martinez, 761 So.2d at 1080 (“there is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant’s guilt”). Further, admission of the detectives’ statements also permitted the State to improperly elicit sympathy for Boyer as a basis for Jackson’s culpability with facts not otherwise in the record— no evidence was introduced indicating Boyer wanted to start a family, came from “well-to-do” parents, or was a “rising star” in the community. As we noted in Tum-blin, the jury would be inclined to give great weight to the investigating officers’ statements that Jackson was guilty “without a shadow of a doubt,” that his denials lacked credibility, and that Boyer was a “rising star” in the community who was intent on starting a family. See Tumblin, 29 So.3d at 1101. Thus, even to the extent the detectives’ statements did yield some *342 what relevant responses, this evidence should not have been admitted as the probative value of Jackson’s statements is minimal when juxtaposed with the inappropriate statements by the detectives. See Pausch, 596 So.2d at 1219 (finding it unreasonable to expect the jury to extract the admissible evidence while disregarding the aspersions of guilt created by the police officer’s inadmissible statements). Accordingly, we find that the trial court abused its discretion by finding the videotaped interrogation admissible at trial. We now discuss whether the error was harmless.
Harmless Error
The State does not address the question of harmless error, even though it is the State’s burden to demonstrate the error is harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1185 (Fla.1986). As beneficiary of the error, the State must prove there is “no reasonable possibility that the error contributed to” Jackson’s conviction. Id. Even so, the Court has a duty to determine harmless error “regardless of any lack of argument on the issue by the state.” Knowles v. State, 848 So.2d 1055, 1057 (Fla.2003) (quoting Goodwin v. State, 751 So.2d 537, 545 (Fla.1999)). Application of the harmless error test requires a close examination of the entire record, “including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.” DiGuilio, 491 So.2d at 1135. This Court, however, has many times emphasized that the harmless error test is not a “sufficiency of the evidence” test or an “overwhelming evidence” test because the relative strength of the permissible evidence does not negate the fact that the impermissible evidence may have played a substantial part in the jury’s deliberation. Id. at 1136; see also Cooper v. State, 43 So.3d 42, 43 (Fla.2010) (reiterating that the harmless error test is whether there is any reasonable possibility that the error affected the verdict); State v. Lee, 531 So.2d 133, 136 (Fla.1988) (recognizing the focus of the harmless error analysis must be the effect of the error on the trier of fact). For the following reasons, we cannot conclude that the error was harmless beyond a reasonable doubt. We first examine the permissible evidence upon which the jury could have legitimately relied.
First, we note that although there was admissible evidence of Jackson’s guilt, there were no eyewitnesses, many items of evidence were not tested by the FDLE for DNA, and the State ceased all investigation once Jackson’s interrogation concluded. The State largely relied on the presence of Jackson’s DNA inside Boyer, which indicates that Jackson had an unprotected sexual encounter with Boyer within a two-hour window prior to Dr. Scheuer-man’s on-scene examination of Boyer’s body. The State also introduced circumstantial evidence demonstrating Jackson had the opportunity to commit the crime. For instance, Jackson eventually admitted that he did walk to work on many occasions and was on Wells Road in some capacity the morning of Boyer’s death, which demonstrated that Jackson was normally near the clinic in the general time-frame Boyer would have been murdered. It is also difficult to reconcile Jackson’s version of events with the State’s evidence. Boyer left her home to go to work between 4:30 a.m. and 4:45 a.m. and her commute was between twenty and thirty-five minutes long. Thus, she was likely in the vicinity of the clinic between 4:50 a.m. and 5:20 a.m. At approximately 5:10 a.m., Boyer stopped at the convenience store close to her work. Both the convenience store’s *343 surveillance tape and the store manager’s testimony indicate that Jackson was not with her. At 5:24 a.m., Boyer deactivated the alarm at work, but most of her many clinic preparation tasks had not been accomplished and most of the lights had not been turned on when other clinic employees arrived. This evidence suggests that Boyer was raped and murdered shortly after arriving at the clinic. According to Jackson’s testimony, however, he never went into the clinic. He also testified that they engaged in consensual, vaginal sex on the morning of her death in the 5:00 a.m. hour, while in her truck, parked in a secluded and dark area of a nearby hotel. He claims he walked to work from there and she drove away, presumably to work. Applying Jackson’s testimony to the other facts, consensual sex could have occurred between 5:00 a.m. and 5:10 a.m., which is when Boyer entered the convenience store near her work. The sexual encounter also could have taken place between 5:12 a.m., when she left the convenience store, and 5:24 a.m., when she arrived at work.
Although Jackson’s claims present a hypothesis of innocence, the jury would have to believe they engaged in consensual sex without a prophylactic, quickly parted ways, and then another unidentified individual brutally attacked, raped, and murdered her without leaving behind any discernible DNA evidence such as semen, or displacing Jackson’s semen. The other possibility, based on the evidence presented by Jackson and defense counsel’s closing argument, is that another unidentified individual, presumably Shad Boyer in a jealous rage after becoming aware of Boyer’s tryst with Jackson, brutally murdered Boyer, wrapped her scrubs and underwear around one ankle, and lifted her shirt above her bra to make it look like a rape had occurred. Thus, it was reasonable for the jury to reject Jackson’s theory of events and find that the permissible evidence is strong evidence of guilt.
Although the State presented strong evidence of guilt, the harmless error test, as noted above, is not whether there was strong evidence of guilt but whether there is “no reasonable possibility that the error contributed to” Jackson’s conviction. See DiGuilio, 491 So.2d at 1135. As previously noted, there were no eyewitnesses, many items of evidence were not tested by the FDLE for DNA, and the State ceased all investigation once the detectives discovered the DNA sample collected from Boyer’s vagina and rectum was a full match with Jackson’s DNA and Jackson’s interrogation concluded. Additionally, the impermissible evidence was lengthy and highly prejudicial. The great majority of the detectives’ recorded statements are repeated expressions of ardent belief as to Jackson’s guilt, including several references to the weight and sufficiency of the State’s evidence, and demands for an explanation of the DNA evidence and crimes. Indeed, several of the detectives’ questions were intended to resolve how and why Jackson killed Boyer and not whether Jackson was the correct suspect. In one particular exchange, Detective Cotchaleovitch stated that he knew Jackson committed the murder because of the way Jackson was looking at him. The jury was likely inclined to attach particular significance to the detectives’ many statements of Jackson’s guilt and ignore Jackson’s denials, concentrating solely on his failure to explain the DNA evidence during his custodial interrogation. This could have had the effect of maximizing the evidentiary value of the DNA evidence and improperly shifting the onus to Jackson to prove his innocence.
Additionally, the detectives’ adamant belief in Jackson’s guilt could have augmented the value of the State’s circumstantial evidence, validated the credibility of State *344 witnesses, and damaged Jackson’s credibility before he was afforded the opportunity to testify or present his case. Any chance the jury would have reasonable doubt regarding Jackson’s guilt would have been obviated by quickly recalling the detectives’ adamant belief in Jackson’s guilt. Additionally, the jury’s sentencing recommendation was not unanimous. The jury recommended by a nine-to-three vote that the trial court impose a sentence of death. The constant exposure to the detectives’ personal beliefs that Jackson was guilty “without a shadow of a doubt” due to the presence of Jackson’s DNA, that Jackson lacked credibility, and that Boyer was a “rising star” in the community could have substantially influenced the verdict and sentence of death. Thus, we cannot conclude that the error was harmless beyond a reasonable doubt.
CONCLUSION
Accordingly, under the facts and circumstances present in this case and for the reasons expressed above, we find that the trial court abused its discretion in admitting the videotaped interrogation at trial because the probative value was substantially .outweighed by the danger of unfair prejudice pursuant to section 90.403, Florida Statutes (2007). We are thus constrained to reverse Jackson’s convictions and remand for a new trial.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON, C.J., concurs.

. Jackson broke into the apartment of a fourteen-year-old girl, placed a pillow over her head, and proceeded to rape her at knife point. Jackson threatened to kill the victim and her mother if she screamed during the attack.

. Boyer had occasionally moonlighted as a stripper for a few years while employed at the vet clinic. According to Jackson, "Haley” was her stripper alias.

. The court found the following aggravators: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of felony probation (great weight); (2) Jackson was previously convicted of another capital felony or felony involving use or threat of violence (burglary of a dwelling and two counts of sexual battery in 1986) (great weight); (3) the murder was committed while Jackson was engaged in the commission of a sexual battery (great weight); and (4) the murder was especially heinous, atrocious, or cruel (HAC) (great weight).

. The nonstatutory mitigators found were: (1) Jackson was a model prisoner and model probationer (slight weight); (2) Jackson had a deprived early childhood without role models (slight weight); (3) Jackson's father was absent from the home (slight weight); (4) Jackson’s mother abandoned him when she moved from Texas to Florida (slight weight); (5) Jackson suffered a severe physical injury (skull fracture) at a young age along with other injuries (slight weight); (6) Jackson was poor (slight weight); (7) Jackson was [sexually] abused by [a woman] when his mother was not around (slight weight); (8) Jackson and his siblings were subjected to sexual abuse and neglect (slight weight); (9) Jackson is capable of adapting well to long-term incarceration (slight weight); (10) Jackson is loved by his family and friends (slight weight); (11) Jackson had a severely dysfunctional family (slight weight); (12) Jackson has friends, cares about others, and brought others to believe in God (slight weight); (13) Jackson believes in God (slight weight); (14) Jackson was subjected to involuntary drug and alcohol use prior to reaching his fifth birthday (slight weight); (15) Jackson was hospitalized and required major surgery on three occasions prior to reaching his third birthday (slight weight); (16) a medical specialist performed an electroencephalogram when Jackson was six-months-old and detected abnormal brain activity, consistent with a seizure disorder; however, there was no follow-up care or treatment (slight weight); (17) Jackson was raised in a low-income housing project situated in an unhealthy and polluted industrial neighborhood (slight weight); (18) as a child, Jackson witnessed violence perpetrated on his mother, who was shot by her husband (slight weight); (19) Jackson was removed from the care and custody of a caring relative and sent to Florida, thus preventing him from receiving treatment and counseling (slight weight); (20) Jackson was sexually abused as a teenager by a juvenile detention counselor who was later arrested for this abuse (slight weight); (21) Jackson’s friends and co-workers describe him as a hard worker, financially responsible, and a good provider (slight weight); (22) Jackson was kind to children and homeless individuals (slight weight); (23) Jackson was polite, cooperative, and respectful to his attorneys and legal staff (slight weight); and (24) Jackson resided with and assisted with the physical care of an older couple with medical issues (slight weight).

. The hyoid bone is a u-shaped bone above the thyroid cartilage in the neck.

. Dr. Scheuerman also testified that the presence of petechiae in and around a person’s eyes indicates that enough pressure was applied during strangulation to cause capillaries to burst, which results in minute pinhead or smaller areas of spilled blood. Further, he testified that blood could only spill out of the burst capillaries if: (1) there is a beating heart; or (2) an area is dependent so that gravity is pulling a small amount of blood out of the adjacent burst capillaries. Here, Dr. Scheuerman testified that the presence of pe-techiae indicated Boyer’s heart was still beating while she was strangled because Boyer was found lying on her back, thus the anterior neck structures would not have been dependent.

. Although the term Hispanic does not describe a race, it appears to be a relevant statistical group in DNA analysis.

. Detective Martin Cotchaleovitch testified that the FDLE standard procedure is to only inventory and test five items of evidence at a time.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

.The Goolsbys informed police and later testified that Jackson routinely walked past the vet clinic on Wells Road to get to work. Romedy also testified that he mostly gave Jackson rides to work after the murder.

. Jackson's trial counsel also proffered evidence that would have been presented to the jury during the penalty phase. Jackson’s counsel stated that fifteen witnesses were prepared to testify. This evidence was introduced at the Spencer hearing through the defense investigator’s testimony regarding what these witnesses told him.

. Spencer v. State, 615 So.2d 688, 691 (Fla.1993) (holding that the trial court should conduct a hearing to allow the parties to be heard, including the defendant in person, and to allow presentation of additional evidence before sentencing).

. Jackson’s claims of error are as follows: (1) the trial court erred in admitting Jackson's recorded custodial interrogation into evidence in the State’s case-in-chief; (2) the trial court erred in denying Jackson’s motion for a judgment of acquittal on the charge of sexual battery; (3) the trial court erred by finding, as an aggravator given great weight, that Jackson was under a sentence of imprisonment, placed on community control, or on felony probation at the time of the murder; (4) the trial court erred in denying Jackson’s request to instruct the jury that Jackson faced a life sentence if the jury convicted Jackson of sexual battery; and (5) Jackson’s death sentence is unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. To the extent the State offered the videotaped interrogation to preemptively discredit or impeach Jackson's intended testimony, this tactic is improper because Jackson had not yet testified. Thus, the matters about which the State sought to impeach him were not placed at issue by evidence. Moreover, defense counsel's assertion during opening statement that Jackson would testify and explain the presence of his DNA and why he failed to recognize Boyer does not open the door for rebuttal or impeachment evidence. See Taylor v. State, 855 So.2d 1, 20 n. 21 (Fla.2003) (citing Burns v. State, 609 So.2d 600, 605 (Fla.1992) (stating that comments made in opening statements do not "open the door” for rebuttal or impeachment testimony as to matters not placed at issue by evidence), and Whitted v. State, 362 So.2d 668, 673 (Fla.1978) (stating that opening remarks of counsel do not constitute evidence)).

. The court read to the jury Florida Standard Jury Instruction 2.6, which states, “You are about to hear recorded conversations. These recorded conversations are proper evidence and you may consider them just as any other evidence....” In this situation, although the court properly used the standard jury instruction and Jackson did not object to its use, the instruction could have inadvertently added more significance to the interrogators’ statements than was likely intended. We also acknowledge that the Fourth and Third District Courts of Appeal have noted that the prejudice of an interrogating officer's statements could be obviated or reduced by reading a limiting instruction to the jury. See Eugene v. State, 53 So.3d 1104, 1112 n. 4 (Fla. 4th DCA 2011); see also Bradshaw v. State, 61 So.3d 1266, 1267 (Fla. 3d DCA 2011).