# Supreme Court of Florida

---

No. SC2023-0055

---

**TYRONE T. JOHNSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 11, 2024

COURIEL, J.

Tyrone T. Johnson was convicted of first-degree murder and sentenced to death for killing Ricky Willis, a 10-year-old boy. This is Johnson's direct appeal.[1] He raises seven issues, but none entitles him to relief. We affirm Johnson's conviction and sentence.

**I**

**A**

At 6:45 p.m. on October 21, 2018, Johnson called 911 from an East Tampa apartment. He said he had shot his girlfriend

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

Stephanie and her 10-year-old son Ricky. Johnson was still on the phone when deputies from the Hillsborough County Sheriff's Office arrived at the scene.

As the deputies approached the apartment, they saw Johnson sitting on the threshold of the screened porch, "screaming and crying." Johnson held a land-line phone receiver and had blood on his hands. Officers brought him to a police vehicle; though Johnson came willingly, the officers had to help him walk because of a recent foot surgery. They took him to the Hillsborough County Criminal Investigation Division.

Investigators searched the two-bedroom apartment that night. On the living room floor they found a Glock 22 .40 caliber handgun and a pocketknife. In the master bedroom, just inside the door, they found the victims' bodies lying parallel to each other in a pool of blood. The victims' heads blocked the master bathroom door shut; later, after the bodies were moved, investigators would find blood spatter matched to Stephanie Willis in that bathroom. Investigators also found seven shell casings, later matched to Johnson's gun, in the master bedroom.

Just outside Ricky's bedroom, investigators found blood on the carpet. In Ricky's bedroom they found a pool of vomit and blood on the floor. Ricky's comforter was torn off his twin bed and his toys were strewn about. Alongside Ricky's bed, investigators found two shell casings that were later matched to the Glock. In the wall under the bed, they found two bullet holes. And under the bed, on top of a pile of toys, they found a significant amount of blood. Crime Lab Analyst Vicki Bellino would later testify it was 700 billion times more likely than not that the blood under Ricky's bed was Ricky's.

As investigators processed the scene, Homicide Detectives Joseph Florio and Dave Tabor interrogated Johnson at the Criminal Investigation Division. The detectives conducted the first portion of the interrogation before reviewing the crime scene evidence. In the video, Johnson was hyperventilating and agitated. The detectives spent several minutes calming him down. Eventually Johnson was *Mirandized*[2] and gave his version of events.

---

2. *Miranda v. Arizona*, 384 U.S. 436 (1966).

Johnson said that he had made dinner for himself and Stephanie. He changed the TV channel and the two started arguing. Things escalated. According to Johnson, Stephanie said, "I see why your son killed his self like a bitch, cause you a bitch."[3] She started hitting him. Johnson told Stephanie the relationship was over. He made a video call to his father and asked him to pick him up the next morning to bring him home to South Carolina.[4] Johnson, still using a medical scooter after foot surgery, rolled into the master bedroom to pack a bag.

Stephanie followed Johnson and continued hitting him. She knocked him off his scooter. She then lifted a PlayStation in the air and prepared to strike him. Johnson picked up his Glock, which he kept loaded alongside his bed, and, in his words, "just started firing." Asked how many times he fired, Johnson said he "just kept firing."

---

3. Johnson's son committed suicide on December 31, 2017, about 10 months before the murders.

4. Johnson's father was on the video call with Johnson for much of the fight. He would later testify that Johnson called him at 6:36 p.m., and that just before 6:40 p.m., he heard what sounded like two gunshots. The call disconnected soon after.

The detectives asked Johnson what happened to Ricky. Johnson said Ricky was in the master bedroom during the initial fight, but at some point, ran out. Ricky came back into the master bedroom, said, "you hurt my mommy," and jumped on Johnson. Johnson said he shoved Ricky off, then "just started firing." He did not remember whom he shot first. At another point, Johnson told the detectives that when Stephanie brandished the PlayStation over him, Ricky was not in the room. Johnson would give similar descriptions of the events several times over the course of his hour-long interrogation.

The detectives reviewed the crime scene evidence later that night. They returned to the interrogation room and, in a second recorded interrogation, confronted Johnson about the blood and shell casings in Ricky's bedroom. Johnson denied that anything happened there. Detective Florio replied, "[T]here is . . . evidence to show that the young man was more than likely trying to get away from you. There is blood on the bottom of his socks, okay. There is blood in his bedroom. What it appears is the body was moved. Did you move that body?" Johnson said he did not. The questioning continued like this for most of the interrogation, but Johnson

maintained that the shootings happened in the master bedroom. Johnson also said there would be no reason investigators would find bullets in Ricky's wall. This second portion of the interrogation lasted about 15 minutes.

The autopsies would later show each victim was shot multiple times at close range. Stephanie Willis had three gunshot wounds: to the middle of her forehead, a corner of her mouth, and her lower chest. The medical examiner identified stippling on her arm—small abrasions that suggested the gun was fired at very close range, "three feet max." The wound to Stephanie's chest had a downward trajectory; the wound to her forehead, which likely caused her death, also had what the medical examiner called "kind of a downward trajectory." Ricky Willis was shot six times: in his temple, jaw, arm, collarbone, thigh, and wrist. The medical examiner said she observed stippling near his wrist. She characterized the wounds to Ricky's wrist and arm as defensive. The cause of Ricky's death was likely the shot to the temple, which had an upward trajectory. The medical examiner testified that even after the other five wounds were inflicted, Ricky would still have been able to move.

## B

### 1

On November 8, 2018, a Hillsborough County grand jury indicted Johnson for the first-degree murder of Ricky Willis (premeditated and felony murder), second-degree murder of Stephanie Willis, and aggravated child abuse. The guilt phase of the trial lasted three days. The State called 19 witnesses and the defense called none.

Among the State's first witnesses was Deputy Dalton Lewis, who arrested Johnson on the night of the murders. Asked what he took into evidence from Johnson, Deputy Lewis said, "He had a blue wallet in the back pocket that I secured, had business cards, bank cards and 100-dollar bill which I suspected to be counterfeit." The defense moved for a mistrial on the ground that the statement about the bill was an allegation of an uncharged separate offense. The prosecutor argued the statement could be cured with an instruction; the defense declined, saying such an instruction would compound the issue. The court elected not to give an instruction and denied the defense's motion for a mistrial.

Later, the State called Homicide Detective Joseph Florio, who along with Detective Dave Tabor interrogated Johnson on the night of the crimes. Before trial, the defense had filed a motion in limine to redact parts of the video of the interrogation. Defense counsel argued that the second portion of the interrogation—the one conducted after the detectives reviewed the crime scene evidence— was inadmissible because it consisted only of the detectives' opinions about the evidence. The trial court denied the motion, noting that Florida Standard Jury Instruction (Criminal) 2.8 would limit any prejudice the second portion might create. Before playing the videos for the jury, it read that instruction:

> You are about to watch a recorded interview that contains opinions and statements by Detective Tabor and Detective Florio to Tyrone Johnson. These opinions and statements are pertinent only to explain the reactions and responses they elicit. You are not to consider these opinions and statements by the police officers as true, but only to establish the context of Tyrone Johnson's reactions and responses.

In closing, the State argued the evidence showed Johnson chased Ricky into his bedroom and shot him as he hid under the bed. It pointed to the shell casings, Ricky's blood, and bullet holes under Ricky's bed. The defense focused on imperfections at the

- 8 -

crime scene and urged the jury to convict Johnson of manslaughter.

The jury found Johnson guilty as charged.

**2**

At the penalty phase trial concerning Ricky's murder, the State argued that three aggravating factors applied: (1) Ricky was less than 12 years of age; (2) Johnson was previously convicted of a felony involving the use of violence to another person—that is, the murder of Stephanie Willis; and (3) Ricky's murder was especially heinous, atrocious, or cruel. The State called four witnesses: Dr. Mary Mainland, the medical examiner; Ricky's aunt; Ricky's grandmother; and, in rebuttal, Dr. Wade Myers, a psychiatrist.

The State presented a victim impact video of Ricky, in which Stephanie interviewed him as part of an audition for the TV show "America's Got Talent." The defense had objected to the video before the penalty phase; it argued the video would unduly prejudice the jury because, while the penalty phase only concerned Ricky's murder, Stephanie was part of the video. The State responded that it was the best evidence it had to show Ricky's

uniqueness and pointed out that Stephanie could not be seen in the video. The court admitted the video.

The defense called 10 witnesses in the penalty phase: Dr. Scot Machlus, a clinical psychologist; Al Johnson, Johnson's brother; Johnson's mother and father; Johnson's four children; Johnson's former employer at the Florida Office of the Attorney General; and a corrections expert.

Dr. Machlus testified to the "impaired capacity" mitigator—that is, that Johnson's capacity to appreciate the criminality of his conduct was substantially impaired. He attributed Johnson's impaired capacity to difficulties in Johnson's childhood and a lifelong battle with depression. Regarding Johnson's childhood, Dr. Machlus discussed the absence of his father, a history of family violence, and abuse Johnson suffered. He detailed the "corporal punishment" inflicted on Johnson and his brother Al by their grandmother: he said the children were "made to strip naked and beaten with extension cords, cords from lamps, fan belts and a black strap." Dr. Machlus also described Johnson's struggles with depression in the decade or so before the murders. Johnson had struggled to hold down a job and maintain relationships. In 2012,

he attempted suicide, and in 2017 was involuntary committed to a psychiatric hospital under the Baker Act[5] for fear he was a danger to himself. On New Year's Eve in 2017, about nine months before the murders, Johnson's son committed suicide, which sent Johnson into a "mental spiral." Dr. Machlus testified that at the time of the murders, Johnson's emotional "dam"—his ability to control his impulses—had burst.

Johnson's brother Al also testified for the defense. Defense counsel asked Al whether their grandmother had ever been abusive, and Al said no.

> Q. Okay. Do you recall visiting with me in Beaufort[, South Carolina]?
>
> A. I do.
>
> Q. And do you recall my asking you specifically about your grandmother . . . ?
>
> A. I do.
>
> Q. Do you recall the phrase "we're getting married today"?
>
> A. My grandmother would use that phrase often when she would talk about the—our discipline. But it was—let me be very clear that my grandmother when she took on that role of disciplining us, it was never an abusive or out of the line disciplinary action. If she had to physically

_____

5. Ch. 394, Fla. Stat. (2017).

- 11 -

spank us or, as in the country they say beat you; but it wasn't a beating, it was a spanking, it was never with—in hatred or malice or leaving bruises or things of that manner.

Q. All right. Do you recall characterizing it quite differently when we met?

A. You would have to refresh that conversation.

After more back and forth, Al said he had heard a story as a child "of my grandmother beating my mother . . . on her wedding day because she was disrespectful or whatever."

Al then testified about his childhood with Johnson. He said that his parents were loving, but also detailed some instances of violence. Al said that when Johnson was four, their father attacked the boys with nunchucks, and their mother shielded them "with her naked body." Al insisted there was little abuse beyond that.

At the end of the penalty phase, the jury found unanimously that the three aggravators advanced by the State had been established beyond a reasonable doubt. The jury recommended that Johnson be sentenced to death for the murder of Ricky Willis.

Some months later, at a status conference, defense counsel told the court it intended to call Al Johnson at the *Spencer*[6] hearing. Counsel said Al's testimony about his childhood was "dramatically different" from what he had told investigators before trial, and suggested Al had downplayed the extent of the abuse. The prosecutor said, "[I]f [Al] comes in here and says he lied, he's going to be charged with a crime so [defense counsel] need[s] to advise him of that." The prosecutor repeated several times that his office would prosecute Al for perjury if he changed his testimony. Eventually the parties and the court agreed to appoint conflict counsel to advise Al.

When Al took the stand at the *Spencer* hearing, defense counsel asked him about an e-mail he had sent the defense team after testifying at the penalty phase. The e-mail was admitted into evidence, and the defense highlighted portions in its examination. Al had written:

---

6. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993) (setting out a procedure that affords both the State and the defendant an opportunity to be heard and present additional evidence to the trial court before it decides whether to impose a death sentence).

During the trial in November, I [was] consumed with emotions, watching my family on both sides of the courtroom become further divided as a family unit . . . .

. . . .

April 4th, 2021, Easter Sunday morning we lost the Matriarch of our family, Victoria S. Taylor. And as one of her 5 grandboys that she reared as her own, I felt I was being asked to defame her character and dishonor her memory in a courtroom filled with strangers and family alike. . . .

. . . .

[T]oday, I would like the opportunity to share and be as transparent as I can be about our upbringing and experiences that may help you build a . . . clearer picture of my brother and his mental, emotional, and spiritual state.

I will not and won't dishonor my grandparents' memories, my parents['] nor my famil[y's] name, but I will tell you the truth and be as transparent as I can be with the questions that are asked today.

Counsel pressed Al on the e-mail until he said, "Honestly, I don't know what I need to do," and was excused to confer with his lawyer.

When Al returned to the stand, defense counsel, now impeaching him, asked whether his testimony before the penalty phase jury was "dramatically different" from what he told the defense team in South Carolina. "[Y]es, it was dramatically different, but it was not the untruth," Al said. Defense counsel turned to the issue of childhood abuse. Al denied that there was any domestic violence between their parents after the boys were six

or seven. Defense counsel confronted him with an investigator's notes, from an interview with Al before trial, that said "[Al] reported witnessing domestic violence between his parents along with [Johnson] from the age of three years old until their adulthood." Al said the notes were "a misstatement or a misrecording."

After the *Spencer* hearing, Johnson moved for a new trial under Florida Rule of Criminal Procedure 3.600(b). He argued Al's testimony deprived him of a fair penalty phase because it downplayed the true extent of the boys' childhood abuse. The court denied the motion.

On December 12, 2022, the trial court sentenced Johnson to death for the murder of Ricky Willis. The court found that the State had proven all three aggravators beyond a reasonable doubt: (1) Ricky was less than 12 years of age (great weight); (2) Johnson was previously convicted of a felony involving the use of violence to another person (great weight); and (3) the murder was especially heinous, atrocious, or cruel (great weight). It found three statutory mitigators were established by a greater weight of the evidence: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (moderate

- 15 -

weight); (2) the defendant has no significant history of prior criminal activity (moderate weight); and (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (slight weight). And the trial court found 30 nonstatutory mitigators, one of which—that Johnson was grieving the suicide of his eldest son— it assigned great weight.[7] In sentencing Johnson to death, the

7. The 30 nonstatutory mitigators were: Johnson, at the time of the offense, was grieving the loss of his eldest son by suicide that had occurred 10 months prior on December 31, 2017 (great weight); Johnson has a long history of mental illness (moderate weight); as a child, Johnson witnessed his father emotionally and physically abusing his mother (moderate weight); Johnson, as a child, along with his siblings, attempted to intervene and rescue their mother from their father's abuses (moderate weight); Johnson suffers or suffered from Chronic Obsessive-Compulsive Disorder (moderate weight); Johnson served in the United States Marine Corps from 1994 to 1998 and was Honorably Discharged (moderate weight); Johnson served in the United States Army from 1998 to 2002 and received a General Discharge Under Honorable Conditions (moderate weight); while Johnson was employed at the Attorney General's Office in the spring and summer of 2017, he was suffering an overall deterioration psychologically that led to him being committed for mental health treatment in June 2017 (moderate weight); Johnson continually sought mental health treatment through the Veteran's Administration, up to and including 12 days before the events in this case (moderate weight); Johnson, in 2013, was diagnosed with Depressive Disorder by the Veteran's Administration (moderate weight); Johnson did not initiate the physical aggression giving rise to the events in this case (moderate

court concluded that the aggravators "heavily outweigh[ed]" the

mitigators. This appeal follows.

---

weight); Johnson, just prior to the gunshots, called his father and asked him to drive down immediately and take him home to South Carolina (moderate weight); Johnson has four surviving children who love him and value his presence in their lives (moderate weight); Johnson has a loving and caring relationship with his parents (moderate weight); Johnson has a close family network of support and affection (moderate weight); Johnson will be sentenced to life without the possibility of parole if the jury does not unanimously find that the death penalty is warranted (moderate weight); Johnson has a Bachelor's Degree in Criminal Justice (slight weight); Johnson has a Master's Degree in Human Services (slight weight); Johnson was employed with the Florida Attorney General's Office in the Child Services Division (slight weight); Johnson was employed with the Magistrate Law Judges in the South Carolina court system (slight weight); Johnson was employed as a Court Administrator for the Supreme Court of South Carolina (slight weight); Johnson is a paralegal (slight weight); Johnson, in 2013, was diagnosed with Anxiety Disorder by the Veteran's Administration (slight weight); Johnson has displayed appropriate courtroom behavior during the trial (slight weight); Johnson performed community service as part of the fraternity he actively participated in (slight weight); Johnson is a skilled mechanic (little weight); Johnson called 911 (little weight); Johnson cooperated with law enforcement (little weight); Johnson could be a mentor to others in prison (little weight); and Johnson's family and friends will continue to support him if he receives life without the possibility of parole (little weight).

- 17 -

Johnson raises seven issues. We focus on three: those arising from the interrogation video, Al Johnson's testimony, and the sentencing order.

**A**

Johnson argues the trial court erred by admitting the second portion of his interrogation video during the guilt phase. By his lights, the second portion contained little more than the interrogating officers' opinions that he was guilty and thus was inadmissible. We disagree.

"The standard of review of a trial court's evidentiary rulings is abuse of discretion." *McDuffie v. State*, 970 So. 2d 312, 326 (Fla. 2007) (citing *Fitzpatrick v. State*, 900 So. 2d 495, 514-15 (Fla. 2005)). A trial court's discretion to admit evidence is broad, *see Davis v. State*, 207 So. 3d 177, 190-91 (Fla. 2016), but it can be abused if an evidentiary ruling is based on an "erroneous view of the law or on a clearly erroneous assessment of the evidence," *McDuffie*, 970 So. 2d at 326 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). And we have said that "a jury may hear an interrogating detective's statements about a crime

when they provoke a relevant response from the defendant being questioned." *McMillian v. State*, 214 So. 3d 1274, 1286 (Fla. 2017) (citing *Jackson v. State*, 18 So. 3d 1016, 1032 (Fla. 2009)).

Johnson compares his case to *Jackson v. State,* 107 So. 3d 328 (Fla. 2012), where this Court found a trial court abused its discretion when it admitted a lengthy interrogation video in which detectives peppered the defendant with accusations. The detectives in *Jackson* repeatedly made statements like, "I know you did it. You used a fire extinguisher. I know you did it," and, "There's no doubt in my mind you did it, okay? There's no doubt . . . ." *Id.* at 335-36. These and other "opinions about Jackson's credibility, guilt, and the weight and sufficiency of the evidence," wrote the Court, "essentially permitted the State to improperly elicit police opinion testimony and invade the province of the jury." *Id.* at 341. It was also significant to the Court that "[t]he great majority of the detectives' statements . . . did not provoke relevant responses." *Id.* at 340. On top of that, the detectives mentioned facts about the victim not otherwise in the record that would likely have elicited sympathy for her. *Id.* at 341. The *Jackson* Court concluded that the probative value of the defendant's responses "was substantially

outweighed by the danger of unfair prejudice" the video created, and thus that the trial court abused its discretion in admitting it. *Id.* at 344 (citing § 90.403, Fla. Stat. (2007)).

That is not what happened here. In the second portion of Johnson's interrogation, the detectives confronted him with evidence that contradicted his initial story and asked him to explain it.

> [S]omething happened in Ry's[8] room. We need you to tell us what happened in Ry's room. We know something happened in there. . . . The only person that I know of that had a gun was you. . . . I got shell casings in Ry's room. . . . How'd they get there?
>
>   . . . .
> [T]here is . . . evidence to show that the young man was more than likely trying to get away from you. There is blood on the bottom of his socks, okay. There is blood in his bedroom. What it appears is the body was moved. Did you move that body?
>
>   . . . .
> I know that evidence will never lie to me, okay . . . but people will try to minimize and try to make themselves out to be something that it's not, okay.
>
>   . . . .
> Tyrone, again, I'm not there, I didn't see it, okay. But when I do go there and I see it, I hope, I hope that it matches your story. What I'm being told right now it doesn't.

---

8. Johnson called Ricky "Ry."

- 20 -

This is not improper opinion testimony, but a routine interrogation. The detectives' questioning provoked several "relevant responses" as to key factual matters. *Id.* at 340. For instance, Johnson stated he had never seen bullet holes in Ricky's wall. He conceded that he was the only person in the house with a gun. And at several points, he gave his version of the timeline of events—a timeline that shifted over the course of the two videos. Before hearing any of this testimony, the jury—unlike the jury in *Jackson*—was instructed "not to consider these opinions and statements by the police officers as true, but only to establish the context of Tyrone Johnson's reactions and responses."

The trial court considered all of this when it admitted the second portion of the interrogation video. We find no abuse of discretion. *See Bush v. State*, 295 So. 3d 179, 204-06 (Fla. 2020) (rejecting similar argument because defendant's story evolved throughout interrogation video); *cf. King v. State*, 260 So. 3d 985, 995-97 (Fla. 2018) (rejecting ineffective assistance of counsel claim after lawyer failed to object to law enforcement statements, because the statements gave context to the interrogation); *McMillian*, 214 So. 3d at 1286-87 (Fla. 2017) (same).

**B**

Johnson argues that the trial court's management of the unusual circumstances of his brother Al's testimony deprived him of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. During the penalty phase, Johnson argues, Al gave false testimony denying their childhood abuse. Al then e-mailed defense counsel that he wanted to come clean at the *Spencer* hearing. But before he could, the State "threatened" Al with perjury charges, locking him into his penalty phase testimony. Had Al not been "threatened," Johnson reasons, he might have recanted his testimony at the *Spencer* hearing, and the trial court might have granted his motion for a new penalty trial. As we shall explain, Johnson is not entitled to relief on this claim.

Because Johnson did not preserve this argument below, we review it for fundamental error. *Spann v. State*, 857 So. 2d 845, 852 (Fla. 2003) ("To be preserved for appeal, 'the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal.'" (quoting *Rodriguez v. State*, 609 So. 2d 493, 499 (Fla. 1992))). Johnson did move for a new trial based on Al Johnson's testimony, but that

argument never mentioned the Eighth and Fourteenth Amendments or the alleged "threat" of perjury. A "fundamental error" is one "that reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Kocaker v. State*, 311 So. 3d 814, 824 (Fla. 2020) (alteration in original) (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)).

Johnson argues the State's "threat" to prosecute Al for perjury violates the rule of *Webb v. Texas*, 409 U.S. 95 (1972), and later cases citing it. The U.S. Supreme Court in *Webb* found a due process violation after a trial judge, unprompted, told a defendant's only witness that the witness need not testify, and that if the witness lied, the judge would "personally see" to it that the witness be indicted for perjury. *Id.* at 95-96. The Court found that "the judge's threatening remarks . . . effectively drove [the] witness off the stand." *Id.* at 98. Johnson also points to *State v. Feaster*, 877 A.2d 229 (N.J. 2005), in which the New Jersey Supreme Court held that a defendant's state constitutional rights were violated when a prosecutor threatened a witness with perjury charges. The witness in that case, Sadlowski, had provided key testimony to convict the

- 23 -

defendant at trial. *Id.* at 233-34. Later, the defendant secured a sworn recantation from Sadlowski and filed it with a postconviction motion. *Id.* at 235. But before Sadlowski could testify at the postconviction hearing, the prosecutor told his lawyer there would be " 'considerations,' *i.e.*, penal consequences," if he recanted, leading Sadlowski to invoke his Fifth Amendment right against self-incrimination. *Id.* at 236.

This case differs from *Webb* in key respects. Here the trial court made no statement about prosecuting Al for perjury. The prosecutor made sure Al was aware of the risk of criminal liability if he elected to change his earlier sworn testimony. The defense agreed that Al should have his own lawyer in light of that risk, and the court appointed one. None of this forced Al from the stand. The jury also heard Al's testimony about his grandmother's having beaten his mother, and about the time their father attacked the boys with nunchucks.

Neither does *Feaster*—which relied on the New Jersey Constitution—support the conclusion that the trial court committed fundamental error. The witness in that case wrote a certified statement, filed in court, that he would testify a certain way. 877

A.2d at 235. The evidence made clear that the prosecutor's threat kept him from doing so. Here, again, the record does not support the conclusions that Al would have testified differently; that the State directly interfered with his testimony; and that, had Al testified differently, the trial court would have granted Johnson a new penalty phase trial. And we do not find in Al's e-mail—which the jury also saw—a basis upon which to conclude that the trial court abused its discretion in concluding that there would not have been a meaningful change to Al's testimony at the *Spencer* hearing. Johnson is not entitled to relief on this claim.

## C

Johnson argues that the trial court made two errors in its sentencing order by misunderstanding two statutory mitigators: the "impaired capacity" mitigator, § 921.141(7)(f), Fla. Stat. (2022), to which it assigned slight weight, and the "no significant history of prior criminal activity" mitigator, § 921.141(7)(a), to which it assigned moderate weight. On the "impaired capacity" mitigator, we find no error. On the "no significant history" mitigator, we do find error, but conclude that the error is harmless.

We review a trial court's assignment of weight to mitigators for abuse of discretion. *See Tundidor v. State*, 221 So. 3d 587, 605 (Fla. 2017) (quoting *Bevel v. State*, 983 So. 2d 505, 521 (Fla. 2008)). That discretion "is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980) (quoting *Delno v. Mkt. St. Ry. Co.*, 124 F.2d 965, 967 (9th Cir. 1942)).

Johnson first argues the trial court misunderstood the "impaired capacity" mitigator. In his view, the trial court believed the mitigator referred to a defendant's capacity to conform his behavior to the law throughout his life rather than at the time of the crime. *See Peterson v. State*, 2 So. 3d 146, 159 (Fla. 2009) (proper focus of mitigator is defendant's "state of mind at the time of the offense"). Johnson is right about what the mitigator refers to, but wrong about the trial court's understanding of it.

In reaching its finding on the "impaired capacity" mitigator, the trial court summarized Dr. Machlus's testimony, and then concluded:

> After reviewing the testimony presented by Dr. Machlus, the Court finds Defendant[] has met his burden in establishing by a greater weight of the evidence that his ability to conform his conduct to the requirements of the law was impaired. However, in light of the fact that Defendant has no prior criminal history and was otherwise able to sufficiently conform his conduct during his years of military service and various jobs, the Court affords this mitigating circumstance slight weight.

Dr. Machlus testified that Johnson's impaired capacity resulted from "adverse childhood events" and from his history of depression. The bulk of Dr. Machlus's testimony centered on Johnson's traumatic upbringing. If Johnson's capacity to appreciate the criminality of his conduct had been impaired since childhood, as Dr. Machlus posited, it would follow that other examples of impaired capacity might have shown up earlier in his life. None did. To the trial court, this was evidence that Johnson's capacity to appreciate the criminality of his conduct at the time of the murder was not as impaired as Dr. Machlus suggested. The trial court did not abuse its discretion in so reasoning.

Johnson next argues the trial court abused its discretion by misunderstanding the "no significant history" mitigator. The trial court wrote:

The Court finds this mitigating factor has been established by the greater weight of the evidence and is uncontroverted. However, the circumstances of this double murder "militate against" this factor. *Ramirez v. State*, 739 So. 2d 568, 582 (Fla. 1999). Accordingly, the Court finds it should be given moderate weight.

This was, as the State concedes, error. A trial court may not factor a contemporaneous conviction into the "no significant history" mitigator. *Scull v. State*, 533 So. 2d 1137, 1143 (Fla. 1988) (holding that a history of prior criminal conduct cannot be established by contemporaneous crimes). *Ramirez*, which the trial court cited, says nothing to the contrary. 739 So. 2d at 582. And there was no evidence in the record that Johnson had any criminal history besides the contemporaneous murder conviction.

And yet, this error is "harmless beyond a reasonable doubt." *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986); *see, e.g., Griffin v. State*, 820 So. 2d 906, 914 n.10 (Fla. 2002) ("Certainly, we will not remand where the trial court's [sentencing] order is only minimally defective."). Consider *Gonzalez v. State*, 136 So. 3d 1125 (Fla. 2014), where the trial court apparently forgot to assign any weight to the "heinous, atrocious, or cruel" (HAC) aggravator. We found that to be error, but concluded it was harmless because the

trial court nonetheless discussed HAC in detail, and otherwise wrote a strong, well-reasoned order. *Id.* at 1160. Similarly, in *Deparvine v. State*, 995 So. 2d 351 (Fla. 2008), the trial court did not "expressly evaluate" a mitigation expert's testimony as required by *Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990). *Deparvine*, 995 So. 2d at 380. That, too, we found to constitute harmless error, because the trial court had found four aggravators and given them all great weight. *Id.* at 381. We reasoned that, even assuming the trial court gave the mitigator "greater weight than any other mitigator it found, there is no reasonable doubt that the trial court would have imposed the death penalty." *Id.*

Here, the trial court documented the facts supporting each aggravator and mitigator, including all 30 nonstatutory mitigators. Both the jury and the trial court found all three aggravators, including HAC, to have been established beyond a reasonable doubt. The trial court wrote in its sentencing order that the aggravators "heavily outweigh[ed]" the mitigators. We conclude that, even if the trial court had assigned the "no significant history" mitigator great rather than moderate weight, "there is no reasonable possibility" that it would not have imposed the death penalty.

*DiGuilio*, 491 So. 2d at 1135; *see Deparvine*, 995 So. 2d at 381.  The trial court's error was harmless beyond a reasonable doubt.

**D**

Johnson raises four more arguments, none of which entitles him to relief.

First, the trial court did not abuse its discretion when it denied Johnson's mistrial motion after Deputy Lewis speculated that a $100 bill in Johnson's wallet was counterfeit.  "[A] trial court should grant a mistrial only 'when it is necessary to ensure that the defendant receives a fair trial.'"  *Card v. State*, 803 So. 2d 613, 621 (Fla. 2001) (quoting *Goodwin v. State*, 751 So. 2d 537, 547 (Fla. 1999)).  "In other words, a motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." *Smiley v. State*, 295 So. 3d 156, 169 (Fla. 2020) (cleaned up).

Deputy Lewis's spontaneous, non-responsive statement was objectionable, *see* § 90.404(2)(a), Fla. Stat. (2018), but in context was not "so prejudicial as to vitiate the entire trial," *Smiley*, 295 So. 3d at 169.  After Deputy Lewis made the statement, the jury saw defense counsel immediately object, and saw the trial court sustain the objection.  After that, Deputy Lewis's statement was never

repeated. Defense counsel made a strategic decision not to press for an instruction. The counterfeit bill allegation also had no logical relationship to the charges Johnson faced. Deputy Lewis's statement did not warrant a mistrial, and the trial court did not abuse its discretion in denying Johnson's motion for one. *See Cole v. State*, 701 So. 2d 845, 853 (Fla. 1997) (no abuse of discretion where trial court denied motion for mistrial after witness unexpectedly mentioned defendant's irrelevant criminal history); *Banks v. State*, 46 So. 3d 989, 997-98 (Fla. 2010) (where trial witness said, unexpectedly, that she had "seen the tape of [the defendant] stabbing Mr. William Johnson," but the stabbing of Mr. William Johnson was irrelevant to the trial).[9]

---

9. Johnson cites *Straight v. State*, 397 So. 2d 903 (Fla. 1981), where this Court said in dicta that irrelevant evidence of a crime not charged is "presumed harmful error." *Id.* at 908. The Court in *Straight* was considering whether a trial court erred by allowing evidence that the defendant shot at his arresting officers. *Id.* at 907. It concluded there was no error because the evidence was relevant. *Id.* at 908. But along the way, the Court wrote a paragraph about propensity evidence where, without a citation, it made the statement to which Johnson cites. *Id.* That misstatement of the law had no bearing on the disposition of the claim, and thus was dicta "without force as precedent." *State ex rel. Biscayne Kennel Club v. Bd. of Bus. Regul. of Dep't of Bus. Regul. of State*, 276 So. 2d 823, 826 (Fla. 1973).

Second, Johnson's right to a fair guilt phase trial was not violated when, during the State's closing argument, the prosecutor stated that Johnson failed to prove diminished capacity. The State, in its rebuttal closing, said the following:

> And obviously, ladies and gentlemen, you can consider all the evidence. I mean, that's the point of what you do here, is to consider all the evidence. But you have not heard a mental health defense. You have not heard insanity. There's been no doctor who's testified before you today and told you that he was insane or didn't have the ability to form any requisite intent to commit the crime.

The defense did not object to this statement at trial. On appeal, Johnson argues the statement violated his right to a fair trial by shifting the burden of proof for a diminished capacity defense onto him, even though that defense is precluded by Florida law. *See Chestnut v. State*, 538 So. 2d 820, 820 (Fla. 1989) (holding that diminished capacity is not a viable defense). Because Johnson failed to preserve this argument, we review the trial court's ruling for fundamental error. *See Kocaker*, 311 So. 3d at 824; *Braddy v. State*, 111 So. 3d 810, 837 (Fla. 2012).

And we find none. The jury was properly instructed on Johnson's presumption of innocence; that Johnson was "not

required to present evidence or prove anything"; and that the State had the burden of proving his guilt. And—aside from the challenged statements—the State's closing argument properly focused on its affirmative case: that it had proved Johnson's guilt beyond a reasonable doubt. Even to the extent the State's comments might have misled the jury, viewed in context, we are hard-pressed to conclude that they wrought fundamental error such that Johnson's conviction could not have been obtained without their assistance. *See Guzman v. State*, 214 So. 3d 625, 636 (Fla. 2017) (no fundamental error even assuming prosecutor improperly shifted burden of proof onto defendant); *cf. Braddy*, 111 So. 3d at 841 (no fundamental error where prosecutor told jurors finding defendant guilty of anything less than first-degree murder "would be a miscarriage of justice"); *Mendoza v. State*, 964 So. 2d 121, 132-33 (Fla. 2007) (no fundamental error where State called defendant's mitigation evidence "excuse[s]" and his expert testimony "garbage").

Third, the trial court did not abuse its discretion by allowing the State to show a victim impact video of Ricky that included Stephanie's voice. "A trial court's decision to admit victim impact

testimony is reviewed for an abuse of discretion." *Kalisz v. State*, 124 So. 3d 185, 211 (Fla. 2013). This Court "regularly upholds the admission of victim impact evidence that falls within the statutory definition." *Sievers v. State*, 355 So. 3d 871, 886 (Fla. 2022). The Legislature requires that victim impact evidence "be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence." § 921.141(8), Fla. Stat. (2022).

The video Johnson challenges falls within the parameters of section 921.141(8), Florida Statutes, and is an appropriate demonstration of Ricky's "uniqueness": Ricky tells the camera where he was born, his favorite subject in school, his favorite sports, his favorite places to go, his favorite TV shows, and that he wants a puppy. The video contained no "[c]haracterizations and opinions about the crime, the defendant, and the appropriate sentence." *Id.* The trial court did not abuse its discretion in admitting it. We also reject Johnson's argument that Florida's statutory scheme for victim impact evidence is facially

unconstitutional. We have repeatedly upheld the constitutionality of the scheme, *see Windom v. State*, 656 So. 2d 432, 438 (Fla. 1995); *Ritchie v. State*, 344 So. 3d 369, 387 (Fla. 2022), and Johnson has not persuaded us that that precedent is "clearly erroneous," *State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020).

Finally, we decline Johnson's invitation to conduct comparative proportionality review. We reaffirm our decision in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), in which we held that comparative proportionality review is not mandated by the Eighth Amendment. *Id.* at 548-52; *see also Loyd v. State*, 379 So. 3d 1080, 1097-98 (Fla. 2023); *Wells v. State*, 364 So. 3d 1005, 1015 (Fla. 2023); *Bevel v. State*, 376 So. 3d 587, 597 (Fla. 2023); *Gordon v. State*, 350 So. 3d 25, 36 (Fla. 2022).

### E

While Johnson does not contest this point, "[i]n appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence." *Davis v. State*, 2 So. 3d 952, 966-67 (Fla. 2008); Fla. R. App. P. 9.142(a)(5). "In determining the sufficiency of the evidence, the question is whether, after viewing

the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Allen v. State*, 322 So. 3d 589, 603 (Fla. 2021) (quoting *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)).

The jury convicted Johnson of first-degree murder on two theories: premeditation and felony murder. Competent, substantial evidence supports Johnson's conviction on each theory.

To convict Johnson of premeditated murder, the jury had to find beyond a reasonable doubt that (1) Ricky Willis was dead, (2) the death was caused by the criminal act of Johnson, and (3) Ricky's death was premeditated. § 782.04(1)(a)1., Fla. Stat. (2018). The defense stipulated to the first element, and effectively conceded the second by arguing for a manslaughter conviction. The third element, premeditation, requires "a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." *Sexton v. State*, 221 So. 3d 547, 558 (Fla. 2017) (quoting *Asay v. State*, 580 So. 2d 610, 612 (Fla. 1991)).

A rational trier of fact could have found beyond a reasonable doubt that Johnson had formed a conscious purpose to kill Ricky. The evidence suggests Johnson shot Ricky as he hid under the bed and then moved Ricky's body. The two casings alongside Ricky's bed matched Johnson's gun, and the wall under Ricky's bed had two bullet holes in it. A significant amount of Ricky's blood was found under the bed. The defense had no explanation for the casings, bullet holes, or blood, except to imply the crime scene was poorly managed. Competent, substantial evidence supports the jury's verdict that Johnson committed first-degree premeditated murder.

To convict Johnson of felony murder, the jury had to find that (1) Ricky Willis was dead, (2) Johnson killed Ricky Willis, and (3) the death was caused by Johnson while engaged in the commission of aggravated child abuse. § 782.04(1)(a)2., Fla. Stat. (2018). Here, too, the first two elements were clearly established. To find Johnson was engaged in the commission of aggravated child abuse, the jury would have had to find he committed aggravated battery against Ricky—that is, committing criminal battery while "[i]ntentionally or knowingly caus[ing] great bodily harm."

§§ 784.03(1)(a), .045(1)(a), Fla. Stat. (2018). A rational trier of fact could have found this. The evidence suggesting Johnson shot Ricky as he hid under the bed, discussed above, supports this conclusion. Further evidence includes the fact Ricky was shot at least six times, and that his defensive wounds suggest he was alive while Johnson shot at him. Competent, substantial evidence supports the jury's verdict that Johnson committed first-degree felony murder.

## III

We affirm Johnson's conviction for first-degree murder and his sentence of death.

It is so ordered.

MUÑIZ, C.J., and CANADY, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I agree that competent, substantial evidence supports Johnson's first-degree murder conviction under both the premeditated murder and felony murder theories.

- 38 -

I concur in result, however, because I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020). In *Lawrence*, this Court abandoned our decades-long practice of comparative proportionality review in the direct appeals of sentences of death.

An Appeal from the Circuit Court in and for Hillsborough County,
    Christopher C. Sabella, Judge
      Case No. 292018CF015518000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Christina Z. Pacheco, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee